## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GERARD KENNEY, ALEXA JOSHUA, GLEN DELA CRUZ MANALO, and KATHERINE MURRAY LEISURE, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No.  2:18-cv-05260-RK |
| AMERICAN BOARD OF INTERNAL MEDICINE, | ) ) ) | Trial by Jury Demanded |
| Defendant. | ) ) | CLASS ACTION |

### AMENDED CLASS ACTION COMPLAINT

Plaintiffs Gerard Kenney, Alexa Joshua, Glen Dela Cruz Manalo, and Katherine Murray-Leisure, (collectively "Plaintiffs"), for their amended complaint against Defendant American Board of Internal Medicine ("ABIM" or "Defendant") hereby allege as follows:

### INTRODUCTION

1.      This case is about ABIM's illegal and anti-competitive conduct in the market for initial board certification of physicians practicing internal medicine (or internists) and the market for maintenance of certification of internists. ABIM is illegally tying its initial certification product to its maintenance of certification product, referred to by ABIM as MOC.

2.      This case is also about ABIM's illegal creation and maintenance of its monopoly power in the market for maintenance of certification. ABIM is the monopoly supplier of initial certifications for internists. Beginning in or about 1990, ABIM used its monopoly position in the initial certification market to create a monopoly in the market of maintenance of certifications for internists, which is the subject of this lawsuit. Since then ABIM has used various anti-

1

competitive, exclusionary, and unlawful actions to promote MOC and prevent and limit the growth of competition from new providers of maintenance of certification for internists. ABIM's conduct, including but not limited to tying and exclusive dealing, has harmed competition by preventing competition from others providing cheaper, less burdensome, and more innovative forms of maintenance of certification desired by internists.

3.      The tying product is ABIM's initial board certification, which it sells to internists nationwide. ABIM sells initial certification services to physicians in internal medicine and twenty foundational subspecialties within the field of internal medicine. Many internists hold multiple ABIM certifications, purchasing initial certifications in both internal medicine and one or more additional subspecialties.

4.      The tied product is MOC, ABIM's maintenance of certification. ABIM has tied MOC to its initial certification. As described more fully below, to drive sales of MOC and to monopolize the market for maintenance of certification, ABIM has forced physicians to purchase MOC, charged inflated monopoly prices for MOC, and thwarted competition in the market for maintenance of certification.

5.      Approximately 200,000 internists, or one of every four physicians in the United States, have purchased initial ABIM certifications. ABIM has throughout the relevant period controlled the market for initial certification of internists in the United States. Through its MOC program, ABIM has also controlled in excess of 95% of the market for maintenance of certification of internists. ABIM has unlawfully obtained and maintained its monopoly power in the market for maintenance of certification services for the anti-competitive purpose of requiring internists to purchase MOC and not deal with competing providers of maintenance of certification services.

2

6.      Finally, this case is about ABIM's violation of Section 1962(c) of the RICO Act. As detailed below, ABIM has successfully waged a campaign in violation of RICO to deceive the public, including but not limited to hospitals and related entities, insurance companies, medical corporations and other employers, and the media, that MOC, among other things, benefits physicians, patients and the public and constitutes self-regulation by internists. Believing ABIM's misrepresentations to be true, hospitals and related entities, insurance companies, medical corporations and other employers require internists to participate in MOC in order to obtain hospital consulting and admitting privileges, reimbursement by insurance companies, employment by medical corporations and other employers, malpractice coverage, and other requirements of the practice of medicine.

7.      Plaintiffs bring this Class Action to recover damages and injunctive and other equitable relief on behalf of all internists required by ABIM to purchase MOC to maintain their initial ABIM certifications.

## JURISDICTION AND VENUE

8.      Plaintiffs bring this action pursuant to the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages, injunctive relief, costs of suit and reasonable attorneys' fees arising from ABIM's violations of Sections 1 and 2 of the Sherman Act (28 U.S.C. §§ 1 and 2). Plaintiffs also bring this action pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* to recover treble damages, injunctive relief, costs of suit and reasonable attorneys' fees arising from ABIM's violations of Section 1962(c) of RICO.

9.      Subject matter jurisdiction is proper under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, RICO, 18 U.S.C. § 1961 *et seq.* and 28 U.S.C. §§ 1331, 1337, and 1367.

10.     ABIM sells its initial certifications and its MOC program in interstate commerce, and the unlawful activities alleged herein have occurred in, and have substantially affected, interstate commerce. ABIM's initial certification services and its MOC program are sold by ABIM in a continuous flow of interstate commerce in all fifty states and U.S. territories, including through and into this judicial district. ABIM's activities as described herein substantially affect interstate trade and commerce in the United States and cause antitrust injury by, among other things, *de facto* forcing Plaintiffs and other internists to purchase MOC, charging inflated monopoly prices for MOC, and reducing competition in the maintenance of certification market. In addition, ABIM's activities as described herein cause racketeering injury because ABIM obtains money and property as a result of Plaintiffs and other internists being *de facto* forced to pay MOC-related fees.

11.     ABIM is subject to personal jurisdiction in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and RICO, 18 U.S.C. § 1965, because ABIM is found in and transacts business herein.

12.     Venue is proper pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, RICO, 18 U.S.C. § 1965, and 28 U.S.C. § 1391, because ABIM resides in this judicial district, and a substantial part of the events giving rise to Plaintiffs' claims occurred herein.

## PARTIES

13.     Plaintiff Gerard Francis Kenney, M.D., ("Dr. Kenney") is a graduate of Pennsylvania State University College of Medicine. He completed his residency in internal medicine in 1993 at Lankenau Medical Center in Wynnewood, Pennsylvania and a fellowship in gastroenterology in 1995, also at Lankenau Medical Center. He has pursued a career in internal

medicine with a principal emphasis in gastroenterology. Dr. Kenney is a resident of Pennsylvania.

14.     Plaintiff Alexa Joshua, M.D., ("Dr. Joshua") graduated in 1986 from Wayne State University School of Medicine, one of the top two ranked medical research institutions in Michigan, according to U.S. News and World Report. She completed her residency in internal medicine at Henry Ford Hospital and has been a practicing internist since 1989. Dr. Joshua is a resident of Michigan.

15.     Plaintiff Glen Dela Cruz Manalo, M.D., ("Dr. Manalo") graduated from Manila Central University College of Medicine in 1990. Dr. Manalo relocated to the United States in 1994 where he completed his residency in internal medicine at the University of Tennessee Medical Center at Knoxville in 1997, a fellowship in gastroenterology at East Tennessee State University in Johnson City, Tennessee in 2000, and a fellowship in hepatology at Carolinas Medical Center in Charlotte, North Carolina in 2001. He has been a practicing gastroenterologist since 2002. Dr. Manalo is a naturalized United States citizen and a resident of Washington.

16.     Plaintiff Katherine Murray-Leisure, M.D., ("Dr. Murray") is a graduate of Harvard Medical School. She completed her infectious diseases fellowship at Penn State Hershey Medical Center and has pursued a career in internal medicine with a principal emphasis in infectious diseases. Dr. Murray is a resident of Massachusetts.

17.     Defendant ABIM is incorporated under the laws of the State of Iowa with its principal place of business at 510 Walnut Street, Philadelphia Pennsylvania, and files with the Internal Revenue Service as a Section 501(c)(3) not-for-profit organization. Through most of its existence ABIM has been led by a small group of academic physicians with scant clinical experience treating patients. ABIM is a member board of the American Board of Medical

Specialties ("ABMS"), an umbrella organization of twenty-four medical boards that today certify physicians in thirty-nine specialties and eighty-six subspecialties.

## BACKGROUND

18.     Licenses to practice medicine in the United States are granted by medical boards of the individual States. To obtain a license a physician is required, among other things, to have an MD degree and to pass the United States Medical Licensing Examination ("USMLE"), a three-step examination for medical licensure sponsored by the Federation of State Medical Boards ("FSMB") and the National Board of Medical Examiners ("NBME").

19.     According to the USMLE website, the examination "assesses a physician's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that are important in health and disease and that constitute the basis of safe and effective patient care."

20.     Most States require a physician to periodically complete continuing medical education courses ("CME") to remain licensed. According to the website of the Accreditation Council for Continuing Medical Education ("ACCME"), which accredits organizations that offer continuous medical education, CME "consists of educational activities which serve to maintain, develop, or increase the knowledge, skills and professional performance and relationships that a physician uses to provide services for patients, the public, or the profession."

21.     According to its 2016 Form 990 filed with the Internal Revenue Service, ABIM's initial certification "demonstrates that physicians have completed internal medicine and subspecialty training and have met rigorous standards through intensive study, self-assessment and evaluation" and "encompasses the six general competencies established by the Accreditation Council for Graduate Medical Education." Approximately 80% of internists, and almost all

practicing internists, purchase initial ABIM certifications. Those who do not include researchers, teachers, academics, and others who may not regularly treat patients.

22.     To obtain initial ABIM board certification a physician must, among other things, pass an ABIM-administered examination. ABIM first began selling initial certifications in 1936.

23.     No State requires an initial ABIM certification for an internist to obtain a license to practice medicine.

**ABIM Requires Internists to Purchase MOC To Maintain Their Initial Certifications**

24.     Initially, ABIM certifications were lifelong and no subsequent examinations or other requirements were imposed by ABIM on internists.

25.     In or about 1975, ABIM devised a voluntary Continuous Professional Development Program ("CPD") for ABIM-certified internists as a complement to its initial board certification. The first CPD examination was administered by ABIM in 1974. Only 3,355 internists took the voluntary examination. Just 2,240 internists took the second voluntary CPD examination in 1977. Even after re-branding it as representing "Advanced Achievement in Internal Medicine" only 1,947 internists took the third voluntary examination in 1980. This 42% drop in participants from the first voluntary examination reflected the minimal value placed on the examinations by internists, the medical community as a whole, and the public.

26.     Faced with declining participation and the resulting drop in enrollment fees paid by internists for the voluntary examinations, ABIM announced it would no longer issue lifelong certifications and would instead require internists to take subsequent must-pass examinations. By no later than 1990, ABIM issued only time-limited initial certifications and forced internists to take new must-pass examinations every ten years or lose their ABIM certification. For example,

those internists obtaining an initial certification in 1990 were forced to take another examination in 2000. ABIM also required internists to complete five self-evaluation modules every ten years.

27.     All internists were required to participate in and purchase MOC by no later than 2000, *except that* physicians with ABIM initial certifications purchased prior to 1990 are "grandfathered" by ABIM: they are not required to purchase MOC and yet are reported as "Certified" on ABIM's website. The President and Chief Executive Officer of ABIM has been quoted as admitting "Grandfathering is a really vexing challenge. It's difficult to defend … I would not see those doctors as equivalent to doctors who recertify."

28.     Thus, ABIM holds "grandfathered" internists to a different standard than their peers, despite the fact these older physicians are many years out of their residency training and may be among those least up to date on current practice.

29.     Upon information and belief, approximately 40% of the internists who obtained their initial certification from ABIM have been "grandfathered."

30.     Requiring internists to purchase MOC from ABIM has allowed ABIM to collect to date hundreds of millions of dollars in related fees from internists. In addition, internists, to their financial and personal detriment, have been required to take countless hours away from their practice and families in order to prepare for and take repeated examinations and to complete the self-assessment modules and other MOC "activities." MOC also takes time away from patients and detracts from relevant patient services, to the detriment of ongoing patient care.

31.     In January 2006, ABIM imposed burdensome changes to MOC. Internists were now also required to accumulate 100 "MOC points" every ten years by completing medical knowledge and practice performance processes. This resulted in substantial additional MOC fees for ABIM. No other organization or entity offered competing maintenance of certification for

internists at this time. ABIM continued to exempt "grandfathered" internists from the requirement to purchase MOC and continued to report them as "Certified."

32.     In 2014, ABIM imposed even more burdensome changes to MOC. Internists were still required to take a must-pass examination every ten years, but were now also required to complete a "MOC activity" every two years and to complete a patient safety and patient survey module every five years. They were also required to accumulate 100 MOC points every five years instead of ten years.

33.     These changes resulted in substantial additional indirect costs to internists in terms of time taken away from their practice, patients, and families. ABIM-certified internists were also now required to "enroll" in MOC. If they did not, ABIM reported them on its website as "Not Meeting MOC Requirements." No other organization or entity offered competing maintenance of certification for internists at this time. ABIM continued to exempt "grandfathered" internists from the requirement to purchase MOC and continued to report them as "Certified."

34.     In 2018, ABIM changed MOC once again. Internists are now required to pay an annual program fee to participate in MOC ($160 in 2019 if paid in the year due), in addition to paying an "assessment fee" for MOC examinations. Those purchasing MOC for internal medicine now have the option of taking a "Knowledge Check-In" test every two years or the single "traditional" must-pass examination every ten years, both of which are now "open-book" further undermining the credibility of MOC. ABIM is phasing in the "Knowledge Check-In" option for subspecialties over the next three years.

35.     Currently, internists who have not purchased MOC from ABIM are reported on ABIM's website as "Not Certified" even though they purchased an initial ABIM certification.

9

ABIM, however, reports "grandfathered" internists as "Certified" even though they do not participate in MOC solely because they purchased an initial ABIM certification before 1990. In fact, upon information and belief, "grandfathered" internists who have voluntarily taken and failed MOC examinations are still reported by ABIM as "Certified."

36.     One analysis projected that complying with MOC costs internists an average of $23,607 in money and time cost over a ten year period, with costs up to $40,495 for some specialists, and that "[t]he 2015 MOC is projected to cost $5.7 billion [internal reference omitted] over the coming decade" from 2015 to 2024, including time costs resulting from 32.7 million physician hours.

37.     MOC has become increasingly mandatory for internists across the country. Plaintiffs and other internists are required by many hospitals and related entities, insurance companies, medical corporations, and other employers to be ABIM-certified to obtain hospital consulting and admitting privileges, reimbursement by insurance companies, employment by medical corporations and other employers, malpractice coverage, and other requirements of the practice of medicine. To create an incentive for internists to purchase MOC, ABIM also obtained as part of the Affordable Care Act a temporary 0.5% Medicare payment incentive for doctors participating in MOC. As a result of these and other circumstances described herein, ABIM-certified internists are forced to purchase MOC or suffer substantial economic consequences.

38.     For example, hospital care is the largest component of health care spending in the United States, accounting for more than $1 trillion a year. The second largest component is physician and clinical services, many of which are now provided by hospitals as well. With the assistance and encouragement of ABIM, and/or persons affiliated with ABIM, many hospitals have adopted bylaws mandating that physicians purchase MOC. This is magnified in hospital

markets that are highly concentrated, *i.e.*, those markets with fewer and typically larger hospitals. Approximately 77% of Americans living in metropolitan areas are in hospital markets considered highly concentrated.

39.     As another example, many Blue Cross Blue Shield companies ("BCBS"), again with the assistance and encouragement of ABIM, and/or persons affiliated with ABIM, require physicians to participate in MOC to receive a panel of patients in their plans or be included in their networks. Patients of internists that do not purchase MOC have been told that their physicians are no longer preferred providers and that they should look for another primary care doctor. In addition, patients whose internists have been denied coverage by BCBS because they have not complied with ABIM's MOC requirements, are typically required to pay a higher "out of network" coinsurance rate (for example, 10% in network versus 30% out of network) to their financial detriment. Nearly one in three Americans have BCBS coverage, and nationwide 96% of hospitals and 92% of physicians are in-network with BCBS.

40.     As a further example, internists who lose hospital privileges because they have not complied with ABIM's MOC requirements typically lose coverage under the hospital's malpractice policy and must purchase more expensive insurance elsewhere.

41.     As with ABIM's initial certification, no State requires maintenance of board certification for an internist to be licensed.

42.     Almost thirty years after ABIM's action to force internists to purchase MOC, no evidence-based relationship has been established between MOC and any beneficial impact on physicians, patients, or the public. This is in marked contrast to the evidence-based medicine ("EBM") practiced today. EBM optimizes medical decision-making by emphasizing the use of evidence from well-designed and well-conducted research.

11

43.     That there is no evidence of an actual causal relationship between MOC and any beneficial impact on physicians, patients, or the public is supported by the facts that: (a) ABIM does not require those it has "grandfathered" to comply with MOC, and (b) according to its website, even ABIM's own recently-funded research only "suggest[s] that MOC is a marker of care quality …." Indeed, at least two ABMS member websites currently include the following statement: "Many qualities are necessary to be a competent physician, and many of these qualities cannot be measured. Thus, board certification is not a warranty that a physician is competent."

44.     ABIM's website makes clear that except for those "grandfathered" by ABIM, initial certifications "must be maintained through ABIM's MOC program." By requiring internists to purchase MOC to remain certified, ABIM created a wholly new and artificial market for maintenance of certification that has generated substantial additional fees for ABIM.

45.     By "grandfathering" older internists, ABIM has also discriminated against younger internists, including women and persons of color, who are under-represented in the group of internists "grandfathered" by ABIM.

46.     The American Medical Association ("AMA") has adopted "AMA Policy H-275.924, Principles on Maintenance of Certification (MOC)," which states, among other things, that "MOC should be based on evidence," "should not be a mandated requirement for licensure, credentialing, reimbursement, network participation or employment," should be relevant to clinical practice," "not present barriers to patient care," and "should include cost effectiveness with full financial transparency, respect for physician's time and their patient care commitments, alignment of MOC requirements with other regulator and payer requirements, and adherence to

12

an evidence basis for both MOC content and processes." ABIM's MOC fails in all of these respects.

## ABIM's Illegal Conduct In Violation Of The Anti-Trust Laws

47.      The product markets relevant to this action are the market for initial board certification of internists and the market for maintenance of certification of internists.

48.      The relevant geographic market is the United States.

49.      Beginning in or about 1990, all internists purchasing initial ABIM certifications have been required to purchase MOC or have their certification terminated by ABIM. Initial ABIM certification is required by ABIM to purchase MOC.

50.      ABIM has throughout the relevant period controlled the market for initial certification of internists in the United States. There are high barriers to entry in the market for initial certification, including technical, economic, and organizational barriers, as demonstrated by the fact that no other organization or entity has ever offered meaningful competing initial certifications for internists.

51.      ABIM has market power in the tying market of initial certification of internists.

52.      Initial certification and maintenance of certification are separate markets and are not interchangeable or a component of one another. That ABIM sold initial certification services for more than fifty years before it started selling MOC establishes that the two markets are distinct.

53.      MOC, according to ABIM's 2016 Form 990, "means something different from initial certification" and "speaks to the question of whether or not an internist is staying current with knowledge and practice in his/her discipline" and is "anchored in whether a physician is meeting a performance standard."

13

54.     Thus, MOC serves substantially the same function as CME. Indeed, MOC points are granted for some contracted external CME activities from subspecialty societies. And, likewise, completion of some MOC education modules might count towards a physician's state licensure CME requirement. Importantly, however, MOC differs from CME because if physicians do not see value in particular CME courses or classes they are free to purchase other CME offerings; there is no such meaningful option regarding MOC.

55.     Internists have a desire to obtain maintenance of certification from providers other than ABIM but have been almost entirely unsuccessful as a result of ABIM's illegal tying and the unlawful and exclusionary use of its monopoly power.

56.     The National Board of Physicians and Surgeons ("NBPAS") was established in or about January 2015 to provide a competing maintenance of certification product to physicians. Its product extends to physicians practicing in all twenty-four ABMS specialties, including internal medicine. NBPAS does not offer initial certifications to internists or any other physicians, but only maintenance of certification.

57.     To obtain maintenance of certification from NBPAS a physician must, among other things, have at one time held a certification from an ABMS member board, hold a valid state license to practice medicine, and complete at least fifty hours of accredited CME within the past twenty-four months (or one hundred hours if an ABIM certification has lapsed). NBPAS fees are vastly lower than those charged by ABIM for MOC, and NBPAS maintenance of certification requires vastly less physician time. For example, in 2017, NBPAS fees were less than 15% of the fees assessed by ABIM for MOC and required much less administrative time for registration.

14

58.     The fact that NBPAS offers maintenance of certification but not initial certification further establishes that the two markets are separate.

59.     NBPAS has had very limited success. In 2016, there were over 10,000 hospitals in the United States, including both those registered with the American Hospital Association ("AHA") and community hospitals. According to the NBPAS website, as of September 2, 2018, only 91 hospitals, less than one percent, accept NBPAS maintenance of certification, and not a single insurance company is known to accept NBPAS maintenance of certification. In addition, ABIM does not recognize NBPAS maintenance of certification.

60.     Upon information and belief, organizations in addition to NBPAS have considered entering, or sought to enter, the market for maintenance of certification services but have been unsuccessful because of the monopoly power and unlawful and exclusionary conduct of ABIM.

61.     ABIM is illegally tying its initial certification to MOC. As a direct and proximate result, Plaintiffs and other internists have been forced to purchase MOC from ABIM since at least 1990 or lose their ABIM certifications.

62.     ABIM also unlawfully created and maintained monopoly power in the market for maintenance of certification by requiring internists to purchase MOC or lose their ABIM certification.

63.     ABIM has induced hospitals and related entities, insurance companies, medical corporations, and other employers to require internists to be ABIM-certified to obtain hospital consulting and admitting privileges, reimbursement by insurance companies, employment by medical corporations and other employers, malpractice coverage, and other requirements of the practice of medicine.

64.     An indication of ABIM's illegal tying and monopoly maintenance is that it is able to charge inflated monopoly prices for MOC, increasing the fees it generates from MOC by 283% since 2000.

65.     As a direct and proximate result of ABIM's illegal tying and monopoly maintenance, Plaintiffs and other internists have together been forced to pay hundreds of millions of dollars in MOC fees and incur other out-of-pocket costs.

66.     Initial certification and maintenance of certification are separate products and services. Numerous board certified internists do not want to be required to buy ABIM's MOC and/or would seek to obtain maintenance of certification from a source other than ABIM.

67.     Because of the repeated changes to MOC, internists purchasing initial ABIM certification and MOC cannot assess the lifetime cost of ABIM certification over the several decades of their practice, making it impossible to calculate the life cycle cost.

68.     In addition, ABIM has been illegally maintaining its monopoly position in the market for maintenance of certification for the anti-competitive purpose of thwarting competition. As a direct and proximate result, NBPAS, an innovative competitor, has been shut out of a substantial portion of the market for maintenance of certification, eliminating meaningful competition in that market to the detriment of Plaintiffs and other internists who are forced to buy MOC at inflated monopoly prices or lose their certification.

69.     ABIM's illegal tying and monopoly maintenance has resulted in overly burdensome conditions imposed by ABIM on internists forced to purchase MOC. These overly burdensome conditions raise the cost of the practice of medicine for Plaintiffs and other internists; constrain the supply of internists thereby harming competition, decrease the supply of

certified internists, and increase the cost of medical services to patients and consumers; and present barriers to patient care.

70.     ABIM's illegal tying, exclusive dealing, and monopoly maintenance results in ABIM *de facto* forcing Plaintiffs and other internists to purchase MOC in order to hold hospital consulting and admitting privileges, reimbursement by insurance companies, employment by medical corporations and other employers, malpractice coverage, and other requirements of the practice of medicine. ABIM's illegal tying and monopoly maintenance further creates and increases barriers to entry to the market for internists' services.

71.     ABIM is governed by a board of directors that includes active participants in the market for internists' services and related markets. ABIM's restraint on competition in the market for internists' services, demonstrated conflicts of interests, and private anticompetitive motives force internists, other than those "grandfathered" by ABIM, to purchase MOC or lose their ABIM certification.

72.     Any alleged justification ABIM might offer for its illegal conduct is either beyond the scope of legitimate pro-competitive justifications or is far outweighed by the anti-competitive effects described herein.

73.     ABIM has economically coerced purchasers of its initial certification to purchase overpriced, unnecessary MOC from ABIM or lose ABIM certification as internists. ABIM's illegal tying, exclusive dealing, and monopoly maintenance has caused anti-competitive effects in the market for maintenance of certification of internists.

17

## Anti-Trust Injury Suffered By Plaintiffs

### Gerard Francis Kenney, MD

74.     Dr. Kenney entered private practice in 1995 as a partner in Digestive Health Specialists, Inc. ("Digestive Health") in Seneca, Pennsylvania and has been practicing gastroenterology for almost twenty-five years. Gastroenterologists diagnose and treat digestive disorders, such as stomach pain, ulcers, reflux, and Crohn's disease. He has served as President of the Venango County Medical Society and Councilor (Region I) of the Pennsylvania Society of Gastroenterology. Dr. Kenney is a member of, among other professional associations, the American Gastroenterological Association and the American College of Gastroenterology.

75.      Dr. Kenney obtained an initial board certification in internal medicine from ABIM in 1993, and a gastroenterology subspecialty certification in 1995. ABIM did not "grandfather" these initial certifications because they were purchased after 1990. Dr. Kenney later passed the MOC examination in gastroenterology in 2007. A proctor who administered the examination referred to MOC as a "money-making operation."

76.     In November 2017, Dr. Kenney accepted an offer of employment from Mount Nittany Physicians Group ("MNPG") that would double his income. MNPG is a multi-specialty group practice owned by Mount Nittany Medical Center in State College, Pennsylvania. In order to assure an orderly transition, Dr. Kenney told his partner that he planned to leave Digestive Health at year-end 2017 and would begin employment with MNPG in early 2018. He also told his staff, about thirty in number, of his plans to give them time to find alternative employment.

77.     Dr. Kenney was later told that to be employed by MNPG he would be required to maintain his ABIM certification in gastroenterology, which was scheduled to be terminated by ABIM effective December 31, 2017. He had already decided by this time, however, not to take

18

the MOC examination again, though he had already paid his MOC annual fees through December 31, 2018. In addition, it was impossible for Dr. Kenney to meet MNPG's requirement because ABIM was not offering the MOC gastroenterology examination again in 2017.

78.     MNPG then revised its offer extending Dr. Kenney's start date to June 30, 2018, but only contingent upon his passing the next MOC gastroenterology examination, scheduled for April 2018. In other words, if Dr. Kenney did not pass the MOC examination, MNPG would rescind its offer.

79.     It was untenable for Dr. Kenney to ask his partner and staff to put their own futures on hold and remain with Digestive Health until he both took the April 2018 MOC examination and then learned the results, expected to take up to an additional ninety days. Alternatively, if Dr. Kenney left private practice at year-end 2017 as originally planned, he faced at least six months without any income from Digestive Health (or MNPG), or longer if he did not pass the MOC examination. Accordingly, Dr. Kenney ultimately could not accept MNPG's revised offer.

80.     ABIM currently reports Dr. Kenney as "Not Certified" on its website even though he obtained initial certifications in internal medicine and gastroenterology. This is misleading because it makes it appear the initial certifications were revoked due to failure to pass a MOC examination, misconduct, or some similar reason rather than having been terminated by ABIM simply because they had lapsed. This is reinforced by ABIM's failure to report Dr. Kenney's gastroenterology MOC certification in 2007 on its website. Because of this presentation by ABIM, Dr. Kenney appears less qualified to patients, hospitals, insurance companies, medical corporations, other employers, and others. Dr. Kenney believes this method of reporting by ABIM on its website pressures doctors into purchasing MOC.

**Alexa Joshua, MD**

81.    Dr. Joshua has provided care for patients in hospital and medical office settings as well as through visits with home-bound patients. She has served patients of ethnically and culturally diverse backgrounds, caring for the insured, underinsured, and uninsured. In 2013, Dr. Joshua was selected for advancement to Fellowship by the American College of Physicians ("ACP"), described on the ACP website as "a mark of distinction representing the pinnacle of integrity, professionalism, and scholarship for doctors pursuing careers in internal medicine," but ultimately declined the invitation for cost reasons.

82.    In 1989, Dr. Joshua began working as an internist affiliated with Henry Ford Hospital providing inpatient care as an employee of Metro-Medical Group, a subsidiary of Health Alliance Plan. Dr. Joshua held consulting and admitting privileges through her affiliation with Henry Ford Hospital. In 2000, Dr. Joshua founded Amethyst Medical Offices, PLC, dba Docrxtor Patience Medical Clinics, PLC, a private internal medicine practice.

83.    Dr. Joshua obtained an initial board certification in internal medicine from ABIM in 2003. ABIM did not "grandfather" her initial certification because it was purchased after 1990.

84.    In 2003, Dr. Joshua affiliated with Detroit Medical Center ("DMC"), the leading Detroit hospital and largest health care provider in Southeast Michigan. Dr. Joshua held consulting and admitting privileges at five area hospitals through her affiliation with DMC, allowing her to admit patients and to consult with other doctors regarding their admitted patients.

85.    In 2009, six years after she began her affiliation with DMC, Dr. Joshua and the rest of the DMC medical staff received a written notice titled "IMPORTANT CREDENTIALING INFORMATION" requiring that effective July 1, 2009, "Board certification

must be maintained in those specialty boards that are time-limited." Dr. Joshua did not pass the required MOC examination in 2014, after which ABIM terminated her certification in internal medicine. She continued to participate in MOC through December 31, 2017.

86.     After Dr. Joshua's certification was terminated by ABIM, her DMC patients were treated by another doctor who, because he had never been certified by ABIM, was not required by DMC to participate in MOC.

87.     On June 1, 2016, Dr. Joshua was told that BCBS would no longer cover her because it "require[d] certification through the American Board of Internal Medicine only." Dr. Joshua appealed the decision, telling BCBS, among other things, that she had been certified by NBPAS in 2015. BCBS rejected her appeal on September 8, 2016.

88.     Dr. Joshua's DMC consulting and admitting privileges expired effective December 31, 2017. Because she had not complied with MOC she was not allowed by DMC to renew those privileges. As a result, Dr. Joshua was no longer permitted to provide inpatient care. Inpatient care is the care of patients whose condition requires admission to a hospital. Instead, Dr. Joshua was restricted to "Membership Only" status, allowing her to provide only outpatient care to DMC patients. Outpatient care, also referred to as ambulatory care, is care that can be provided in a medical center without an overnight stay. A practice including inpatient care is typically more remunerative than a practice limited to outpatient care.

89.     ABIM currently reports Dr. Joshua on its website as "Not Certified" even though she obtained an initial certification in internal medicine. The ABIM website also advises that if a doctor is not listed as certified, "they may be certified by another board of the American Board of Medical Specialties" but does not also refer to NBPAS, from which Dr. Joshua holds a current certification, as an alternative certifying board.

21

**Glen Dela Cruz Manalo, MD**

90.     Dr. Manalo held teaching appointments at James H. Quillen College of Medicine as a clinical instructor from 1997 to 2000, and at Vanderbilt University School of Medicine as an associate professor of medicine from 2002 to 2007. Dr. Manalo was selected as a top gastroenterologist in Billings, Montana by the International Association of Healthcare Professionals for 2011.

91.     Dr. Manalo obtained an initial board certification in internal medicine from ABIM in 1997, and a gastroenterology subspecialty certification in 2000. ABIM did not "grandfather" these initial certifications because they were purchased after 1990.

92.     Dr. Manalo served as staff gastroenterologist with Tennessee Valley Health Care Systems, a United States Department of Veterans Affairs medical center, from September 2002 to September 2007. In October 2007, Dr. Manalo took a position at St. Vincent Healthcare in Billings, Montana ("St. Vincent") at a base salary of $400,000, capped at $800,000 annually, and also received a lump sum recruitment incentive of $50,000. He replaced a doctor who had recently retired and who had never been certified by ABIM in internal medicine or gastroenterology.

93.     Dr. Manalo's ABIM certification in internal medicine was terminated in 2007 after he decided not to purchase MOC. He wrote ABIM on June 6, 2009, among other things, that it was "unfair and outright discriminatory that practitioners certified on or after 1990 are the only ones required to certify" and that he was "interested in recertifying in my subspecialty [gastroenterology] and would do so provided that all are required to certify …" Dr. Manalo never received a response or even the courtesy of an acknowledgement of receipt of his email from

ABIM, which terminated his certification in gastroenterology in December 2010 after he again decided not to purchase MOC.

94.     Based on his review of the medical literature at the time and continuing to today, Dr. Manalo has found no connection between MOC and doctor competence or improved patient outcomes. He also believes ABIM's grant of a blanket "grandfather" status to all internists who purchased their initial certifications prior to 1990 to be discriminatory and unfair. Based on his own observations, shared by other doctors whose views and comments he monitors on medical websites, Dr. Manalo considers MOC to be a money-making monopoly that imposes unnecessary and burdensome time and financial constraints on internists.

95.     St. Vincent told Dr. Manalo that he would lose his staff privileges unless he maintained his ABIM gastroenterology certification (which could only be only be maintained by purchasing MOC) and that ABIM certification was required by the St. Vincent Medical Staff bylaws. He was told that maintaining his ABIM certification was "also a requirement of many payers [insurance companies] to ensure reimbursement for your services." Dr. Manalo offered to earn additional CME credits beyond what was required by the St. Vincent bylaws. He was told, however, that this was not an acceptable alternative to ABIM certification and MOC.

96.     Dr. Manalo was terminated by St. Vincent effective December 31, 2010, due to his refusal to participate in MOC and to purchase a renewal of his ABIM certification. He was also caused upon his termination to forfeit $33,514.60 in his St. Vincent Retirement Plan account.

97.     Dr. Manalo received positive reviews from patients and staff who advocated with St. Vincent to allow Dr. Manalo to remain on the medical staff. For example:

-- a Registered Nurse wrote: "Dr. Manalo does the most endoscopic procedures for the hospital. He is requested more and more by our patient population … I am pleading you to find a way to keep him here."

-- a patient wrote: "Dr. Manalo is in a league of his own … Since he conducts his business, his commitments, and his personal interactions with such unquestioned professionalism and unflagging concern for others, I feel he is a doctor that is a must for GI Diagnostics. Please keep this doctor on board for my future visits and medical needs. He is really that good!"

-- another Registered Nurse wrote: "I would like to say that Dr. Manalo is a rare find. He is loved by his patients and staff alike. His caliber of expertise, compassion and overall likeability will be a hard (if not impossible) act to follow."

-- an endoscopy technician wrote: "Dr. Manalo is one of the most knowledgeable and thorough gastroenterologists I have worked with."

-- another St. Vincent staff member wrote: "I would have to say that after what I have seen I would have my family see Dr. Manalo as my first choice … The loss of revenue when Dr. Manalo leaves will be dramatic."

98.    In addition, the St. Vincent Chief Medical Officer wrote Dr. Manalo that: "My personal sentiments are that I would love to continue having you as a colleague. You have provided excellent care of my patients that I have referred, and you have a great reputation among your colleagues and in the endoscopy suite." He also acknowledged that he found MOC "at times onerous and not particularly relevant to my clinical practice of medicine." Nonetheless, he reiterated that the St. Vincent bylaws required MOC and that "[m]any insurers have also made board certification a requirement for procedural reimbursement."

99.    Dr. Manalo was told when he started at St. Vincent that it had taken almost ten years to recruit a gastroenterologist, and believes it took St. Vincent several years to fill his position after he was terminated, to the detriment of St. Vincent and its patients.

100.    After looking for employment for several months, Dr. Manalo took a position in April 2011 as staff gastroenterologist at Jonathan M. Wainwright Memorial Veterans Affairs Medical Center in Walla Walla, Washington ("Wainwright"). His annual salary at Wainwright

was $265,000, substantially less than the base salary of $400,000 he had been receiving at St. Vincent. He also received a recruitment incentive of $66,250 from Wainwright, paid over time.

101.    Dr. Manalo remained at Wainwright until its gastroenterology practice closed in July 2017. Despite actively searching for another position, he remains unemployed. Although he is eligible for NPBAS certification, he was told by hospitals at which he sought employment that they recognized only ABIM certification and MOC.

102.    ABIM currently reports Dr. Manalo on its website as "Not Certified" even though he obtained initial certifications in internal medicine and gastroenterology.

**Katherine Murray-Leisure, MD**

103.    Dr. Murray worked with leprosy and syphilis patients as a Lieutenant JG in the Commissioned Corps of the United States Public Health Service. She investigated sand fly-borne leishmaniasis in veterans of Operation Desert Shield and Operation Desert Storm, a disease with ulcers of the skin or inside the nose with cyclic fevers and sometimes an enlarged spleen. Dr. Murray and colleagues shared their medical research findings at microbiology and infectious diseases meetings and with the Pennsylvania Medical Society, the American Medical Association, and the United States Congress. She received national recognition from the United States Department of Veterans Affairs, Veterans of Foreign Wars, and the American Legion. She has thirty peer-reviewed publications in the field of infectious diseases and is a member of the American Society of Tropical Medicine and the Infectious Diseases Society of America. Dr. Murray is a past President of the Lebanon County Medical Society, Pennsylvania, and is currently a County Delegate for the Massachusetts Medical Society.

104.    Dr. Murray obtained an initial and lifelong board certification in internal medicine from ABIM in 1984. She had her first child in 1986 during her infectious diseases fellowship, and purchased an infectious diseases subspecialty initial ABIM certification in 1990.

Although Dr. Murray is "grandfathered" in internal medicine with a lifelong certification, ABIM did not "grandfather" her initial infectious diseases certification because it was purchased after 1990.

105.     Dr. Murray was required to purchase infectious diseases MOC recertifications in 2000 and again ten years later in order to maintain her subspecialty certification. This required disruptive patient practice questionnaires, two years of test-taking practices, four years of meritless so-called self-evaluation modules, and six hour examinations with standardized two-minute test questions at a remote test site under uncomfortable conditions.

106.     Dr. Murray was the infectious diseases ("ID") consultant and hospital epidemiologist for twenty years, from 1987-2007, at three hospitals in Lebanon, Pennsylvania: the Lebanon Veterans Administration Medical Center, Good Samaritan Hospital, and the Lebanon Valley General Hospital birthing facility. In 2010, Dr. Murray relocated from Pennsylvania back to Massachusetts, closer to her aging parents, and started infectious diseases consultations in Plymouth, Massachusetts. She associated with another ID consultant at Beth Israel Deaconess Hospital-Plymouth ("BID-Plymouth") in the South Shore region of Massachusetts, then known as Jordan Hospital. She was one of only two specialists in infectious diseases with consulting staff privileges. Her consultative practice grew quickly during the time Dr. Murray was associated with Jordan Hospital.

107.     Holding privileges in infectious diseases at Jordan Hospital was a crucial part of Dr. Murray's practice. Physicians holding such privileges provide a service not otherwise available or available only in limited supply by other members of the medical staff. Infectious disease consultants see patients on hospital floors, in Emergency Rooms, and in intensive care units. They provide services only at the request of other members of the medical staff. Bedside

26

infectious disease consultations improve patient survival, control deadly *Clostridium difficile* gut infections, and lessen the thirty-day readmission risk for patients after discharge.

108.     The Jordan Hospital bylaws required that physicians holding staff privileges such as Dr. Murray be ABIM-certified in their area of specialty. Dr. Murray reviewed Jordan Hospital's bylaws which exempted certain senior physicians but required all new physicians to have not only an ABIM certification but also participate in MOC to continue hospital work in their subspecialty.

109.     ABIM terminated Dr. Murray's infectious diseases certification after she did not pass her MOC examination in 2009. In spite of strongly supportive patient and colleague recommendations, Dr. Murray's infectious diseases privileges (but not her "grandfathered" internal medicine privileges) were revoked by Jordan Hospital in May 2011, consistent with the bylaws requirement that Dr. Murray maintain her ABIM certification and participate in MOC.

110.     Dr. Murray received no patient complaints and had received positive performance reviews from Jordan Hospital colleagues before ABIM terminated her infectious diseases certification. Citing among other things that her certification in internal medicine had been "grandfathered" by ABIM, Dr. Murray, with staff support, sought to retain her infectious diseases consulting staff privileges at Jordan Hospital as extended internal medicine reports, but to no avail.

111.     Dr. Murray passed her MOC examination later in May 2012. Infectious diseases privileges were restored by Jordan Hospital. During enrollment in MOC she had notified ABIM of serious typographical errors (for example, systemic vascular resistance versus sustained viral response) and other mistakes, and erroneous information particularly on the practice exam modules. She noted that best answers were frequently not offered in complex case scenarios. She

27

found many questions on MOC exams irrelevant to clinical practice and today's resource-constricted needs. For example, no commercial laboratories were differentiating *Rickettsia rickettsii* from *Rickettsia parkeri* on serum antibody tests. Four of 170 questions focused on shingles Varicella zoster virus vaccine, whereas none addressed common diabetic foot infections possibly resulting in leg amputations. So-called correct answers were too often flawed or biased due to what appeared to Dr. Murray to be conflicted commercial interests. For example, ABIM promoted inflated shingles vaccine efficacy rates among their correct answers based upon manufacturer-sponsored studies on young volunteers rather than objective data involving frail elderly patients like those seen in Dr. Murray's clinical practice.

112.    Dr. Murray lost one year's infectious diseases consulting income, as a result of the MOC requirement, and more importantly, the opportunity to help hundreds of patients recover from serious, often drug-resistant, infections.

113.    Dr. Murray's personal professional standing and reputation were tarnished by the even-temporary loss of her infectious diseases certification. She found it necessary to explain to bewildered patients how professional careers were arbitrarily and wrongfully damaged to support the revenue flow of an unaccountable, highly-flawed private testing and recertification monopoly. She lamented with patients and practicing medical staff how MOC compromised patient access to already certified, experienced specialists. Beginning in 2013 on behalf of young and mid-career doctors, Dr. Murray worked with other staff to update the Jordan Hospital bylaws to eliminate MOC requirements and to recognize recertification by the National Board of Physicians and Surgeons, the sponsor of a substantially less expensive and time consuming and more relevant recertification process. These efforts were unsuccessful.

## CLASS ACTION ALLEGATIONS

114.    Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Plaintiff Class: all internists required by ABIM to purchase MOC from ABIM to maintain their initial ABIM certifications. Specifically excluded from this Class are the officers, directors, or employees of ABIM, or of any entity in which ABIM has a controlling interest, or any affiliate, legal representative, or assign of ABIM. Also excluded from this Class are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

115.    The Class is so numerous that joinder of all members is impracticable. On information and belief, the Class consists of more than 100,000 internists.

116.     Common questions of law and fact exist as to all Class members and predominate over any questions affecting only individual members of the Class, including legal or factual issues relating to liability or damages. The common questions of law and fact include, but are not limited to: (1) whether ABIM is engaging in illegal tying; (2) whether ABIM has illegally created and is maintaining its monopoly power in the market for maintenance of certification; (3) whether ABIM conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c); (4) whether the conduct of Defendant, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Class; (5) whether ABIM was unjustly enriched as a result of the conduct alleged in this Complaint; (6) the appropriate injunctive and related equitable relief; and (7) the appropriate class-wide measure of damages.

29

117.    Plaintiffs' claims are typical of the claims of other Class members. Plaintiffs and all members of the Class are similarly affected by Defendant's wrongful conduct in that they were all forced to purchase ABIM's MOC in order to maintain certification. Plaintiffs' interests are coincident with and not antagonistic, or in conflict with, other Class members' interests. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiffs will fairly and adequately protect the interests of other Class members.

118.    Plaintiffs have retained competent counsel experienced in class action and complex litigation to prosecute this action vigorously.

119.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

120.    The Class is manageable, and management of this action will not preclude its maintenance as a class action.

## COUNT ONE

### Illegal Tying in Violation of Section 1 of the Sherman Act

121.   Plaintiffs incorporate by reference all of the above allegations.

122.   ABIM's tying of its initial board certification service and its MOC program is a *per se* violation of Section 1 of the Sherman Act.

123.   Alternatively, even if ABIM's tying arrangement is not *per se* illegal, it nevertheless violates Section 1 of the Sherman Act under the "Rule of Reason" because it is an unreasonable restraint on trade.

124.   There is no legitimate business or other pro-competitive justification for ABIM's illegal tying of its initial certification service to its MOC program.

125.   As described above, ABIM's illegal conduct has anticompetitive effects in the market for maintenance of certification.

## COUNT TWO

### Illegal Monopolization and Monopoly Maintenance in Violation of Section 2 of the Sherman Act

126.   Plaintiffs incorporate by reference all of the above allegations.

127.   ABIM's creation of its monopoly power in the market for maintenance of certification is a violation of Section 2 of the Sherman Act.

128.   ABIM's maintenance of its monopoly power in the market for maintenance of certification is a violation of Section 2 of the Sherman Act.

129.   As described above, ABIM's illegal conduct has anticompetitive effects in the market for maintenance of certification.

## COUNT THREE

### Violation of Section 1962(c) of the RICO Act

130.    Plaintiffs incorporate by reference all of the above allegations.

### ADDITIONAL BACKGROUND

131.    Since ABIM imposed its MOC program, it has successfully waged a campaign to deceive the public, including but not limited to hospitals and related entities, insurance companies, medical corporations and other employers, and the media, that MOC, among other things, benefits physicians, patients and the public and constitutes self-regulation by internists.

132.    Knowing that its statements of fact detailed below about MOC are fraudulent, false, and misleading, ABIM now defends MOC on the basis that "Board certified doctors earn a higher salary" and specifically an "18% higher salary." Such a money-centered justification insults the internist community and reflects the true economic interests of ABIM, its officers, directors, and key employees.

### ABIM's Fraudulent, False, and Misleading Statements of Fact About MOC

133.    ABIM has throughout the relevant time knowingly made fraudulent, false, and misleading statements of fact about MOC to the public, including but not limited to hospitals and related entities, insurance companies, medical corporations and other employers, and the media.

134.    For example, at the very outset of the MOC program, ABIM's then-Chair, Dr. Christine Karen Cassel ("Dr. Cassel"), made the fraudulent, false, and misleading statement of fact in an ABIM "Perspectives" newsletter dated Summer 1999, that "the current certification process and the new evolving recertification initiative which is dedicated to continued professional development serve those needs and produce a reliable indicator of physician quality." This was before the first MOC examination had even been administered by ABIM,

making it literally impossible for ABIM and Dr. Cassel to know whether MOC would ever be "a reliable indicator of physician quality" as represented.

135.    In the almost thirty years since ABIM first imposed its MOC program, ABIM and its agents have continued making fraudulent, false, and misleading statements of fact about MOC to the public, including but not limited to hospitals and related entities, insurance companies, medical corporations and other employers, and the media. These include but are not limited to the following statements of fact made by ABIM on its website:

a.    "Doctors who maintain ABIM board certification are more likely to meet important quality metrics throughout their careers";

b.    "Women are more likely to get breast cancer screenings they need when they see internists who maintain board certification";

c.    "There is compelling evidence showing that MOC improves value of care without sacrificing quality";

d.    "MOC makes a difference";

e.    "Evidence shows that physicians who maintain their certification (MOC) provide better patient care"; and

f.    Under a banner titled "The value and cost of MOC in 2019" the representation that:

> "3 things Board Certified Physicians are more likely to do
> Save more lives
> Adhere to guidelines
> Reduce health care costs."

The same or similar statements of fact and others to the same effect have been made by ABIM and its agents repeatedly over the years, in addition to appearing on its website.

136.    ABIM knows that its statements of fact are fraudulent, false, and misleading for at least the following reasons. First, because no evidence-based causal relationship has ever been

established between MOC and its purported benefits, ABIM's references to supporting

"evidence" and "compelling evidence" are fraudulent, false, and misleading. This is especially

true in the context of the medical profession where medical decision-making emphasizes the use

of evidence from well-designed and well-conducted research. ABIM and its agents, many of

whom are physicians, are rightly held to an evidence-based standard in their representations

about MOC.

137.    ABIM occasionally concedes elsewhere that its own recently-funded research

only "suggest[s] that MOC is a marker of care quality …. ," that MOC is merely "associated"

with the benefits claimed by ABIM, and that "further research is needed to understand how

MOC might increase the quality of care that patients receive." These infrequent and buried

concessions reveal ABIM is aware that its own research does not support a causal relationship

between MOC and any beneficial impact on physicians, patients, or the public. As one

commentator has noted, the differences in outcomes relied upon by ABIM as "evidence" and

"compelling evidence" account only for "unimpressive differences in medical practice."

138.    Second, ABIM knows that the MOC examination itself lacks predictive validity

for assessing physician competence. ABIM uses a modified Angoff method for its MOC

examination, which uses multiple-choice questions and an automated test assembly ("ATA")

program. Briefly, this requires subject matter experts or judges (selected by ABIM) to estimate

the possibility that a "minimally competent candidate" will correctly answer each item on the

examination. The passing score is then set by ABIM based on the estimates of the judges.

Multiple-choice questions in general and the modified Angoff method in particular may be

appropriate for testing minimal competence of residency program graduates who have recently

completed a standardized and proscribed clinical experience. Their use to assess the competence

34

of highly specialized physicians who already have an initial ABIM certification and manage complex and diverse practices and clinical scenarios—which renders even the concept of a "minimally competent candidate" impossible to define—is highly problematic.

139.    In addition, MOC candidates have been told that the examination content may vary at different testing locations, so that internists sitting for the examination in the same year, or even the same day, may not necessarily receive the same test questions. Yet, ABIM has not documented to candidates that the different tests are equivalent—that is, that the questions selected by the ATA program yielded equivalent content, degree of difficulty, practice relevance, or other relevant criteria across examinations. Thus, for example, Candidate A may answer more questions correctly than Candidate B who takes an allegedly equivalent examination at another time or location, but Candidate A might still fail while Candidate B passes. And finally, undisclosed "pre-test questions" are included as part of each MOC examination that are not counted in the final score even though a candidate may answer them correctly.

140.    Unsurprisingly then, the general internal medicine first-time MOC annual pass rate has varied wildly between 2000 and 2017. In the first three years of the imposition of MOC, the pass rate was 89%, 92%, and 91%, respectively. Over the next four years, however, the pass rate declined 12%, to just 79% in 2006. After the internist community expressed concern over the sharp decline, the pass rate climbed back 13% in just two years, to 92% in 2008. Over the next five years, however, the pass rate declined again an even more precipitous 14%, to just 78% in 2013. Concern was again expressed, and there was again a quick turnaround and a 10% climb in the pass rate in just two years, to 88% in 2015. It has held at over 90% in 2016 and 2017, when ABIM's MOC program has perhaps been subject to more scrutiny and criticism than ever before.

35

141.    Even assuming an innocent explanation for the varying pass rates, at a minimum it is a cause for concern given that MOC is represented by ABIM as establishing some sort of a standard. The bouncing up and down of the pass rate, confirms that the MOC examination is not a reliably valid metric for identifying a "minimally competent" physician specialist already in practice. ABIM's statements to the contrary described above are, indeed, fraudulent, false and misleading. The inherent fluctuations in scores and pass rates makes it impossible for ABIM to truthfully claim any connection between MOC and a beneficial impact on physicians, patients, or the public.

142.    Third, as to whether "MOC makes a difference" as represented by ABIM, the fact that tens of thousands of internists are "grandfathered" and not required to ever participate in MOC but are still held out as Certified by ABIM, makes a mockery of this particular representation. Presumably, if participating in MOC were required to ensure physician competency no one would be no "grandfathered." The President and Chief Executive Officer of ABIM has been quoted as admitting "Grandfathering is a really vexing challenge. It's difficult to defend … I would not see those doctors as equivalent to doctors who recertify." Nonetheless, this has not prevented ABIM from making the fraudulent, false, and misleading statement of fact that "MOC makes a difference."

**MOC Fees and Compensation Paid to ABIM Officers, Directors, and Key Employees**

143.    MOC fees have almost tripled since ABIM first administered the MOC exam. In 2000, the MOC fee for internal medicine was $795, and an additional $995 for each subspecialty. Current MOC fees have *increased* by 283% since then, to $2,250 for internal medicine and $2,800 for each subspecialty.

36

144.     In the eleven years since ABIM began disclosing MOC revenue separately from initial certification revenue, MOC revenue has also almost tripled. In ABIM's Form 990 for the fiscal year ending June 30, 2006, MOC revenue was $8,879,155. In ABIM's Form 990 for the fiscal year ending June 30, 2017, MOC revenue was $24,637,595, an increase of 277%. During that same time, initial certification revenue rose from $16,501,870 to $30,713,991, an increase of just 182%.

145.     For the fiscal year ending June 30, 2006, MOC revenue was approximately 54% of initial certification revenue, and about 35% of ABIM's total program revenue. For the fiscal year ending June 30, 2017, MOC revenue had *increased* to 80% of initial certification revenue and 45% of ABIM's total program revenue.

146.     While the total amount of initial certification revenue and MOC revenue has tripled since 2000, the total expense for those programs has only doubled. For the fiscal year ending June 30, 2000, the total amount of initial certification expense and MOC expense was $19,257,852. For the fiscal year ending June 30, 2017, the total amount of initial certification expense and MOC expense was $41,432,475, an increase of 215%. Further, from the fiscal year ending June 30, 2013, to the fiscal year ending June 30, 2017, initial certification expense dropped from $26,218,299 to $19,582,799. During that same time, MOC expense increased by almost the same amount, from $14,623,390 to $21,849,676.

147.     From the fiscal year ending June 30, 2013, to the fiscal year ending June 30, 2017, the total amount of initial certification revenue and MOC revenue remained relatively flat ($55,031,933 and $55,351,586, respectively). The total amount of initial certification expense and MOC expense during that time also remained relatively flat ($40,841,649 and $41,432,475, respectively). Overhead expense for MOC (including

compensation and benefits for employees), however, almost doubled from $9,478,406 in 2013, to $17,571,725 in 2017, an increase of 185%.

148.     These data demonstrate MOC is an ever-increasing revenue source for ABIM. This is not surprising. Recent residency program graduates, who now more than ever are burdened with substantial debt as they launch their medical careers, pay initial certification fees. There is only so much in fees that can be extracted from these recent graduates. MOC, on the other hand, is imposed by ABIM on older doctors who have been practicing for up to almost thirty years, and have more financial wherewithal to pay ABIM's ever-increasing MOC fees. Thus, it is no coincidence that MOC fees have tripled. In short, ABIM created a lucrative new revenue source by imposing MOC on older and more established doctors. This is confirmed by the fact that MOC revenue has increased at a much faster rate than initial certification revenue, and is now close to half of ABIM's total revenue. Initial certification expense has also dropped substantially since 2013, while MOC expense has increased by roughly the same amount, with most of that increase reflected in increased MOC overhead.

149.     That overhead includes paying overly generous compensation to the ABIM President. In calendar year 1999, the year before MOC was fully implemented, ABIM's then-President, Dr. Harry Kimball, earned $363,932. When he left ABIM in 2003, three years after MOC's implementation, he was paid $1,260,065 (including deferred compensation). That same year, Dr. Cassel, the incoming ABIM President, was also paid $461,874 by ABIM and an additional $120,500 from another ABIM-related entity, the ABIM Foundation ("Foundation").

150.     When Dr. Cassel became ABIM President, she also began serving as President of the Foundation. Her compensation was allocated 75% to ABIM, and 25% to the Foundation. Dr. Cassel's total compensation increased to $1,002,620 in 2008, and when she left ABIM in mid-

2013, she was paid $1,712,847 (including deferred compensation). Dr. Richard Baron ("Dr. Baron"), the incoming ABIM President was also paid $365,135 in total compensation in 2013. Since then Dr. Baron's total annual compensation has averaged over $800,000. According to the Medscape Internist Compensation Report 2017, the average annual compensation for internists in 2017 was $225,000. ABIM transferred $5 million to the Foundation in 1990, the year it first imposed MOC.

151.    Compensation for others in ABIM leadership has also increased since the advent of MOC. For the fiscal year ending June 30, 2000, then-current officers, directors, and key employees were paid a total of $1,309,377. For the fiscal year ending June 30, 2017, that total had risen to $4,210,980, an increase of 322%.

152.    Also included in overhead are ABIM's lavish pension plan accruals and contributions, which between 2000 and 2017, ranged between 7.4% and 12% annually, with an average annual contribution of 9.7%. By contrast, data from the National Compensation Survey reported by the Bureau of Labor Statistics, reveal that the average retirement contribution by non-profit organizations is 4.5%.

153.    Between 1990 and 2008, ABIM transferred approximately $56 million to the Foundation. All or substantially all of those funds were fees paid by internists for initial certification and MOC. The Foundation during that time purchased a $2.3 million condominium in Philadelphia used by, perhaps among others, ABIM officers, directors, and key employees. The condominium was sold in 2016 after questions were raised about its purchase and use. Upon information and belief, the Foundation has recently begun transferring back to ABIM some of the funds it received from ABIM during the 1990-2008 time period.

## ABIM's Fraudulent, False, and Misleading Statement
## of Fact that MOC Constitutes Self-Regulation

154.    As part of its campaign in support of MOC, ABIM claims that MOC is a part of

the important process of professional self-regulation. For example, former ABIM President Dr.

Cassel was quoted in a 2012 *New England Journal of Medicine* article discussing physician

competence and MOC, where she "emphasized" that, "The privilege of professional self-

regulation is granted by society … " Similarly, David H. Johnson, a member of the ABIM Board

of Directors from 2007 to 2015 (and Chair from 2013-2015) reiterated in a 2017 *Journal of the*

*American Medical Association* article that MOC constitutes self-regulation by the medical

profession. The statement of fact that MOC constitutes self-regulation provides an unwarranted

veneer of respectability and integrity to MOC when, as alleged herein, the facts are to the

contrary. ABIM makes it appear that MOC is accepted by the internist community as self-

regulation, which is misleading and untrue.

155.    ABIM knows its statement that MOC constitutes self-regulation is fraudulent,

false, and misleading for at least two reasons. First, not meeting MOC requirements is not

grounds for revocation or suspension of an internist's license to practice medicine or to

undertake any other disciplinary action. Those self-regulatory functions are mandated and

implemented by the medical boards of the individual States, the only relevant self-regulatory

bodies. As alleged above, however, internists who do not comply with MOC requirements face

the loss of hospital consulting and admitting privileges, reimbursement by insurance companies,

employment by medical corporations and other employers, malpractice coverage, and other

requirements of the practice of medicine. In substance, ABIM seeks nothing less than to usurp

the medical boards of the individual States as the self-regulatory bodies of the medical

profession.

40

156.    Second, ABIM is not a "self"-regulatory body in any meaningful sense for, among reasons, its complete lack of accountability. Unlike the medical boards of the individual States, for example, as alleged above, ABIM is a revenue-driven entity beholden to its own financial interests and those of its officers, directors, and key employees. ABIM itself is not subject to legislative, regulatory, administrative, or other oversight by any other persons, entity, or organization. It answers to no one, much less to the internist community which it brazenly claims to self-regulate.

## The Enterprise

157.    At all relevant times, ABMS, its member organizations (including ABIM), and its associate member organizations constituted an association-in-fact enterprise (the "Enterprise"), the affairs of which affected interstate commerce.

158.    Currently, the twenty-four member organizations of ABMS are: the American Board of Dermatology; the American Board of Obstetrics and Gynecology; the American Board of Ophthalmology; the American Board of Otolaryngology—Head and Neck Surgery; the American Board of Orthopaedic Surgery; the American Board of Pediatrics; the American Board of Psychiatry and Neurology; the American Board of Radiology; the American Board of Urology; ABIM; the American Board of Pathology; the American Board of Surgery; the American Board of Neurological Surgery; the American Board of Anesthesiology; the American Board of Plastic Surgery; the American Board of Physical Medicine and Rehabilitation; the American Board of Colon and Rectal Surgery; the American Board of Preventive Medicine; the American Board of Allergy and Immunology; the American Board of Nuclear Medicine; the American Board of Thoracic Surgery; the American Board of Emergency Medicine; and the

American Board of Medical Genetics and Genomics ("Member Boards"). Each Member Board is a separate and independent entity.

159.    Currently, the nine associate members organizations of ABMS are: the Accreditation Council for Continuing Medical Education, the Accreditation Council for Graduate Medical Education, the American Hospital Association, the American Medical Association, Association of American Medical Colleges, Council of Medical Specialty Societies, Educational Commission for Foreign Medical Graduates, Federation of State Medical Boards, and National Board of Medical Examiners ("Associate Members"). Each Associate Member is a separate and independent entity.

160.    During the relevant time and until today, the Enterprise had a common purpose purportedly to improve the quality of graduate medical education, the standards of medical practice, and the physician certification process. This has included, among other things, adopting General Standards providing a broad structure for continuing certification programs for Member Boards, including ABIM. These General Standards are applicable across the Member Boards while permitting relevant distinctions in the separate individual programs. For example, the Enterprise has adopted a four-part framework for continuing certification programs consisting of: Professionalism and Professional Standing; Lifelong Learning and Self-Assessment; Assessment of Knowledge, Judgment, and Skills; and Improvement in Medical Practice. The Enterprise updates its General Standards from time to time, including most recently on January 15, 2014, for implementation in 2015. Thus, the affairs of the Enterprise at all relevant times have included the continuing certification process, including ABIM's MOC program applicable to Plaintiffs.

161.    Since at least 1933 and continuing to today, the Enterprise has functioned as a continuing unit with a common purpose and an *ad hoc* and collaborative decision-making

42

structure, with ABMS, the Member Boards, and the Associate Members working together in partnership.

**Mail and Wire Fraud**

162.     There were in force and effect at all relevant times criminal statutes of the United States involving mail and wire fraud, 18 U.S.C. § 1341 and 18 U.S.C. § 1343 ("Federal Anti-Fraud Statutes"). Those statutes currently state in relevant parts as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises … for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon … any such matter or thing, shall be … [punished according to law].

> * * *

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be [punished according to law].

163.     ABIM has "devised" and implemented a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" in violation of the Federal Anti-Fraud Statutes, by knowingly and falsely misrepresenting MOC as benefiting physicians, patients, and the public. As part of its "scheme

43

or artifice" in violation of the Federal Anti-Fraud Statutes, as alleged above, ABIM obtains

money and property as a result of Plaintiffs and other internists being *de facto* forced to pay

MOC-related fees.

164.    ABIM has engaged in its "scheme or artifice" in violation of the Federal Anti-

Fraud Statutes, in order to drive sales of its MOC program thereby allowing it to generate

substantial MOC fees. ABIM does not use these fees to benefit physicians, patients, or the

public. Instead ABIM uses the fees to, among other things, influence and lobby hospitals and

related entities, insurance companies, medical corporations and other employers, and others to

require or promote MOC; support an entirely new MOC-related bureaucracy within ABIM on

the pretense that it benefits physicians, patients, and the public, and constitutes self-regulation by

internists; pay inflated compensation to ABIM management; and fund a lucrative retirement plan

for ABIM management and employees.

165.    ABIM has also engaged in its "scheme or artifice" in violation of the Federal

Anti-Fraud Statutes, in order to maintain its monopoly position in the initial certification market,

create and maintain a monopoly in the market of maintenance of certifications for internists, and

prevent and limit the growth of competition from new providers of maintenance of certification

for internists, as alleged above.

166.    "[F]or the purpose of executing [its] scheme or artifice" in violation of the Federal

Anti-Fraud Statutes, ABIM has knowingly made false or fraudulent statements to the public,

including but not limited to hospitals and related entities, insurance companies, medical

corporations and other employers, and the media, that, among other things, MOC benefits

physicians, patients and the public and constitutes self-regulation by internists. Believing these

misrepresentations to be true, hospitals and related entities, insurance companies, medical

corporations and other employers require internists to participate in MOC in order to obtain hospital consulting and admitting privileges, reimbursement by insurance companies, employment by medical corporations and other employers, malpractice coverage, and other requirements of the practice of medicine.

167. "[F]or the purpose of executing [its] scheme or artifice" in violation of the Federal Anti-Fraud Statutes and to sustain, advance and prevent detection, ABIM has used MOC fees to underwrite its own recently-funded research that ABIM misrepresents as evidence of an actual causal relationship between MOC and any beneficial impact on physicians, patients, and the public.

168. ABIM has on numerous occasions caused the United States Postal Service, private or commercial interstate carriers, and interstate wires and telephone lines to be used in furtherance of its "scheme or artifice" in violation of the Federal Anti-Fraud Statutes. These predicate acts include but are not limited to:

  a. mailing, wiring, or transmitting through the internet communications with internists connected to participation in MOC. By way of example only, such communications include the following:

    i. Email communications with internists providing reports of the status of their participation in MOC, including expiration dates for their certification and specific requirements for maintenance of that certification;

    ii. Email communications providing registration information for upcoming examination dates;

    iii. Email communications regarding new MOC modules available to internists in their particular specialty;

    iv. Email communications notifying internists about recognition from health plans for completing practice improvement modules;

45

     v.       Email communications notifying internists about new MOC programs;

     vi.      Email communications reminding internists about completion of MOC modules;

     vii.     Email notifications to internists about expiration of certifications;

    viii.     Email confirmations to internists regarding exam seating and other examination information;

     ix.      Email confirmations with internists regarding earning of MOC points;

     x.       Email communications with internists about concerns relating to MOC examinations, including issues relating to specific questions on the exams; and

     xi.      Email notifications re payment of MOC fees;

b.    accepting by mail, wire, or through internet service providers, payments for fees connected to participation in MOC;

c.    transmitting through its website false and fraudulent statements to the effect that MOC assured the quality of physicians practicing internal medicine; and

d.    transmitting through its website false and fraudulent statements to the effect that participation in MOC assured patient safety.

## <u>Section 1962(c) Violation</u>

167.    ABIM is a person as that term is defined in 18 U.S.C. § 1961(3), and was at all relevant times a member of the Enterprise. Through its membership, ABIM has been at all relevant times associated with the Enterprise.

168.    ABIM has throughout the relevant time knowingly conducted or participated, directly or indirectly, in the conduct of the affairs of the Enterprise, *i.e.*, the physician certification process, through a pattern of racketeering activity consisting of the above-described violations of the Federal Anti-Fraud Statutes, in violation of 18 U.S.C. § 1962(c).

169.     ABIM knew that the United States Postal Service, private or commercial interstate carriers, and interstate wires and telephone lines would be used in furtherance of the scheme to defraud, in violation of the Federal Anti-Fraud Statutes.

170.     The uses of the mails and wires alleged above in furtherance of the scheme to defraud has throughout the relevant time been the regular way of conducting the ongoing business activities of ABIM related to the physician certification process and its MOC program.

171.     Plaintiffs have been injured in their business and property as a direct result of the violations of Section 1962(c) alleged herein in an amount not yet fully determined.

## COUNT FOUR

### Unjust Enrichment

172.     Plaintiffs incorporate by reference all of the above allegations.

173.     Plaintiffs and members of the Class conferred a benefit on ABIM in the form of the money and property ABIM wrongfully obtained as a result of Plaintiffs and other internists being *de facto* forced to pay MOC-related fees, as described in detail above.

174.     ABIM has retained these benefits that it acquired from charging Plaintiff and members of the Class inappropriate, unreasonable, and unlawful MOC-related fees. ABIM is aware of and appreciates these benefits.

175.     ABIM's conduct has caused it to be unjustly enriched at the expense of Plaintiffs and the other Class members. As such, it would be unjust to permit retention of these monies by ABIM under the circumstances of this case without the payment of restitution to Plaintiffs and Class members.

176.     ABIM should consequently be required to disgorge this unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against ABIM as follows:

1.      The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class;

2.      The unlawful conduct alleged herein be adjudged and decreed:

      a.      A *per se* violation of Section 1 of the Sherman Act;

      b.      An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

      c.      Illegal monopolization and monopoly maintenance in violation of Section 2 of the Sherman Act;

      d.      A violation of RICO, 18 U.S.C. § 1962(c); and

      e.      To constitute unjust enrichment;

3.      Plaintiffs and the Class be awarded damages, to the maximum extent allowed under federal antitrust laws and RICO, and Defendant be required to disgorge the amounts by which it has been unjustly enriched;

4.      Defendant, its affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on its behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct alleged herein and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

48

5.     Plaintiffs and the members of the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

6.     Plaintiffs and the members of the Class be awarded their costs of suit, including reasonable attorneys' fees, as provided by law; and

7.     Plaintiffs and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.


Date: January 23, 2019                              Respectfully submitted,

                                                             _____

                                                             C. Philip Curley (admitted *pro hac vice*)
                                                             Alan F. Curley (admitted *pro hac vice*)
                                                             Cynthia H. Hyndman (admitted *pro hac vice*)
                                                             Samuel G. Royko (admitted *pro hac vice*)
                                                             ROBINSON CURLEY P.C.
                                                             300 South Wacker Drive, Suite 1700
                                                             Chicago, IL 60606
                                                             Tel: 312.663.3100
                                                             Fax: 312.663.0303
                                                             pcurley@robinsoncurley.com
                                                             acurley@robinsoncurley.com
                                                             chyndman@robinsoncurley.com
                                                             sroyko@robinsoncurley.com

Steven J. Greenfogel
Mindee J. Reuben
LITE DEPALMA GREENBURG, LLC
1835 Market Street, Suite 2700
Philadelphia, PA 19103
Tel: 267.519.8306
Fax: 973.623.0858
sgreenfogel@litedepalma.com
mreuben@litedepalma.com

Katrina Carroll (admitted *pro hac vice*)
LITE DEPALMA GREEBERG, LLC
111 West Washington, Suite 1240
Chicago, IL 60602
Tel: 312.750.1265
Fax: 312.212.5919
kcarroll@litedepalma.com

*Counsel for Plaintiffs, Gerard Kenney, Alexa
Joshua, Glen Dela Cruz Manalo, and Katherine
Murray Leisure*

## CERTIFICATE OF SERVICE

I, C. Philip Curley, an attorney, hereby certify that I caused a copy of the foregoing

**Notice of Filing of Amended Class Action Complaint and Amended Class Action**

**Complaint** to be served on all counsel of record by electronic transmission via CM/ECF on

January 23, 2019.

_____